**James Baldini**
**15 Devita Rd.**
**Branchville NJ 07860**
**(Pro Se)**

**James Baldini**
15 Devita Rd.
Branchville NJ 07860

**Samime Baldini**
15 Devita Rd.
Branchville NJ 07860

And Their Child:
**Derya Demirtas**
(In Guardiandhip)
15 Devita Rd.
Branchville NJ 07860

Plaintiffs,

vs.

**Dr. Nikita Shah**
Bellevue Hospital Center
462 First Avenue
New York, New York 10016
Defendant

**Dr. Robert Nathan Link**
Chief Medical Officer,
Medical Directors Office
Bellevue Hospital Center
462 First Avenue
New York, New York 10016
Co Defendants

**Catherine Ann Gursky Esq.**
Associate Executive Director
Bellevue Hospital Center
462 First Avenue
New York, New York 10016
Co Defendant

**Bellevue Hospital Center**
462 First Avenue
New York, New York 10016
Defendant

Jury trial demanded

Case No.:

# 17 CV 8260

United States District Court

for the Southern District of New York

CIVIL DIVISION

COMPLAINT

JURY TRIAL DEMANDED

## CIVIL ACTION COMPLAINT

1

## THE PARTIES

The Plaintiffs, James and Samime Baldini, and their child Derya Demirtas, (represented by her parents who were granted guardianship from the Sussex County Surrogate on September 30, 2016,) hereafter known as Plaintiffs, all residing at their family residence at 15 Devita Rd. Branchville County of Sussex in the State of New Jersey, brings this Complaint against the Defendant Dr. Nikita Shah Bellevue Hospital Center 462 First Avenue New York, New York 10016; and Co Defendant Dr. Robert Nathan Link, Chief Medical Officer, Medical Directors Office, Bellevue Hospital Center, 462 First Avenue, New York, New York 10016, and Co Defendant Catherine Ann Gursky Esq., Associate Executive Director Bellevue Hospital Center 462 First Avenue New York, New York 10016, and Co Defendant Bellevue Hospital Center at 462 First Avenue New York, New York 10016, Hereafter referred to as Defendants on this day and aver the following.

## JURISDICTION

Jurisdiction in proper as Jurisdiction is Diverse. All Plaintiff's live in the State of New Jersey before during and after these incidents and are citizens of that state. All Defendants reside and work, operating at a principal place of business with its principal place of work in the State of New York and are citizens of that state. Also, the Controversy between them is in excess of 75 thousand dollars being the amount of 75 million dollars. Therefore, both factors of the Diversity and Amount in Controversy tests are satisfied and the Jurisdiction of this Court is Proper. Jurisdiction exists pursuant to 28 U.S.C. § 1332- Diversity of Citizen and Amount in Controversy and Supplemental Jurisdiction under 28 U.S.C. § 1367(a) as all claims arise out of the same case and controversy.

8) She is incorrectly treated at this facility for psychiatric conditions instead of a regime to control the infection in her brain.

9) The Psychiatric treatment has no positive affect.

10) Derya is Discharged from Newton Memorial Hospital on Dec 12, from Newton Mental Health, psychosis unknown.

11) Even though the treatment in Newton is incorrect, it serves the purpose of demonstrating what kind of treatment is not effective and starts her parents on the search for an accurate diagnosis and treatment.

12) Dr. Jenny Blanchard D.O. sees Derya at her office in around December 16, 2014 Dr. Jenny Blanchard D.O. Diagnosis's Derya with PANS (Pediatric Acute-onset Neuropsychiatric Syndrome)

13) Dr. Blanchard refers plaintiffs to see Dr. Denis Bouboulis  of Darien Connecticut (an immunologists.)

14) Dr. Bouboulis of Darien Connecticut examines Derya and determines she is suffering from: autoimmune encephalopathy.

15) The first appointment with Dr. Bouboulis is on or around December 23, 2014.

16) On or about that appointment, Dr. Bouboulis diagnosis's Derya with Autoimmune Encephalitis (dismisses a Bi-Polar diagnosis).

17) In March 2015, Derya Demirtas and Samime and James Baldini go to appointment with Dr. Trifeletti.

18) Dr.  Trifeletti orders an ultrasound of Derya's abdomen. He fails to notify parents of the teratoma that the ultrasound identifies.  He identifies Derya as having PANS/PANDAS.

4

19) Plaintiffs have a first appointment with Dr. Najjar on or about August 18, 2015 to help identify the source of the infection, (several were canceled at this point.)

20) Dr. Najjar identifies the terratoma in Derya's ovary and directs that it might be the cause of the Autoimmune Encephalitis.  Dr. Najjar schedules a post-surgery appointment.

21) On November19, 2015, the terratoma on Derya's ovary is removed at Hackettstown Hospital.

22) Between November 2015 to approximately May 2016, Derya's psychosis decreases and she comes back to 80% of who she was.  She is responsive and coherent, if a little fragile. She can answer questions, take care of her personal hygiene and other daily needs like feeding herself.

23) Derya is off all psychotropic medications for this time period.

24) Derya is only being treated for the infection of her brain for this time period.

25) Derya Audits classes at Sussex County Community College in the Spring 2016 Semester.

26) Derya Gets a job.

27) Derya gets a part of a play at the Sussex County Community College.

28) Derya is released from a driving restriction (by Dr. Jenny Blanchard).

29) Derya Volunteers at the local food bank.

30) Derya Goes to several Yoga, art and several classes (Outside of what SCCC offers)

31) Derya is well on her way to a complete recovery.

32) In April of 2016, Derya sees Dr. Jyounchi at St. Peter's University Hospital.

33) Dr. Jynouchi states according to various tests, Derya has autoimmune encephalitis, she will need IVIG Treatment and possible plasma exchange to defeat the infection further.

5

34) On May 4, 2016, Derya had an appointment with Dr. Bouboulis to establish the end of the medical hold with Amherst College so that Derya could return to the school in Fall of 2016.

35) Dr Bouboulis letter arrives in mail May 7, 2014, giving Derya a go to go back to Amherst in Fall of 2016.

36) On May 6, 2016 (Friday,) IVIG medications had arrived.

37) Dr. Najjar prescribed the IVIG and date was Scheduled for IVIG Treatment.

38) Derya, having regained almost complete function, is now resisting treatment for the infection and delaying it by refusing treatment.

39) Derya's condition begins to relapse.

40) Derya again shows signs of mental impairment due to the brain infection including the loss of rationalizing behavior and committing the same behavior she had before the infection was treated.

41) On May 6, 2016 Derya leaves home, taking the family Trail Blazer.  Samime is unable to contact her.

42) Samime contacts the New Jersey State Police.

43) Her parents explain to the State Police Derya 's mental health disability and that she has a diagnosis of Autoimmune Encephalitis.

44) The New Jersey State Police put out a missing person's bulletin.

45) Derya calls Plaintiff James Baldini at 4am on May 7, 2016 and says she has crashed the Trailblazer and has been wandering around for the past four hours and is now at Penn Station in New York City in the State of New York,

46) Derya informs her Father, that the Trailblazer is totaled and she needs to be picked up.

47) The Metropolitan Transportation Authority Police, MTA, is notified via the NJ State Police.

48) Derya is picked up at Penn Station and transported to Bellevue Hospital in New York City for evaluation and treatment.

49) Derya is in the Bellevue Hospital Emergency Room.

50) Bellevue ER staff is informed of Derya's diagnosis of Autoimmune Encephalitis (Hereafter referred to as AE) by her parents.

51) Derya's parents provide Bellevue with Derya 's STANDING DIAGNOSIS.

52) The information given Bellevue shows the appropriate doctor's orders.

53) Derya's parents also provide information on the STANDING TREATMENT Derya has been receiving from her doctors for the previous approximate ONE and ONE HALF YEARS.

54) Derya's parents provide Bellevue letters and documents including treatment scheduled for May 9, 2016 of IVIG.

55) During the ER stay Derya is repeatedly given anti-psychotics despite being told by parents that these drugs historically cause Derya to worsen due to her diagnosis.

56) Derya is admitted into Neurology Department at Bellevue on May 7, 2016.

57) Derya is angry and upset about her situation and is repeatedly given drugs that worsen her state and cause her to behavior to worsen.

58) Bellevue responds with restraints and assaults that considering Bellevue's refusal to treat her according to her year long standing diagnosis, resulted in unnecessary suffering and abuse.

59) By May 8 2016, her psychosis (brought on by the untreated infection) has increased.

7

60) Bellevue gave Derya all sorts of different psychotropic medications, including Haldol which Derya responded to in an adverse way.

61) Derya is allergic to Haldol, which hospital has been repeatedly been informed of by her parents.

62) In the Hospital Derya's conditioned worsened, manifested by increasing in number and severity of behaviors.

63) Bellevue changed her diagnosis.

64) Plaintiffs were later informed of the change of May 9 2016 that Bellevue changed DX to psychiatric and not autoimmune encephalitis.

65) Bellevue put her on an involuntary hold.

66) This would increase the amount of insurance payment Defendants would receive.

67) Bellevue could not get a bed to May 10, 2016 and they put her on an involuntary hold.

68) Derya is transferred to Psychiatric Wing of Bellevue Hospital.

69) From the first day at Bellevue on May 7 2016, and subsequently, Derya's parents repeatedly informed Doctors, staff, and Officials at Bellevue that they have the resources in place, including doctors and staff and family to treat Derya in New Jersey.

70) From the first day at Bellevue on May 7 2016, and subsequently, Derya's parents repeatedly inform Doctors, staff, and Officials at Bellevue that they have the resources in place to transfer and transport Derya to treatment in New Jersey.

71) From the first day at Bellevue on May 7 2016, and subsequently, Derya's parents repeatedly inform Doctors, Staff, and Officials at Bellevue that they have the resources in place to treat Derya in New Jersey specifically, Dr. Najjar prescribed the IVIG treatment

8

of May 9 2016 that she desperately needed to get back on course to recover from the infection.

72) From the first day at Bellevue on May 7 2016, and subsequently, Derya's parents repeatedly inform Doctors, Staff, and Officials at Bellevue who knowingly and intentionally, recklessly, and negligently DENIED Derya the treatment she needed for her year and one half standing diagnosis.

73) From the first day at Bellevue on May 7 2016, and subsequently, Derya's parents repeatedly inform Doctors, Staff, and Officials at Bellevue who knowingly and intentionally, recklessly, and negligently IGNORED the treatment she needed for her year and one half standing diagnosis.

74) Derya spends 75 days in Bellevue.

75) For that 75 days Bellevue officials received insurance funds from Derya's parent's insurance plan.

76) Events at Bellevue demonstrate the willful, intentional, and tortious behavior of the Doctors, staff and Officials.

77) From May 9-10 Bellevue designates Derya as NOT having autoimmune encephalitis. May 10 Derya transferred to Psychiatric Unit.

78) On May 11, Plaintiffs Mom and Dad were denied visitation due to Derya's behavior – "Jose" from Patient Advocacy informed parents.

79) On May 18 at a "Family meeting," Bellevue Dr. Nikita Shah states that Derya has Bi-polar and Manic Diagnosis.  She states that in many cases the best answer is the easiest answer and this is the easiest answer - because many young women have breaks like this.

Despite reminding Dr. Shah of the history of Derya's illness - Dr. Shah ignores information.

80) Because of the improper diagnosis, Derya's condition worsen as manifested by her increasing behaviors including:  On May 20 Derya claims to have been raped and that multiple staff are having sex on the unit. Derya also says that she is going to get back at Dr. Shah.

81) On May 24 at a New York City Mental Health Court - Dr. Shah states that Derya is Bi-polar and Manic.  Court papers also indicate that Derya is non-domiciled.  (Which was a lie, she knew full well that Derya was from New Jersey, had a residence there with her parents, and that her parents wanted to return her there.)

82) Defendants Dr. Robert Nathan Link, Chief Medical Officer, Medical Director at Bellevue Hospital, Dr. Nikita Shah, and Catherine Ann Gursky, Esq. continually opposed releasing Derya to her parents and proper treatment.

83) Defendants Dr. Robert Nathan Link, Chief Medical Officer, Medical Director at Bellevue Hospital, Dr. Nikita Shah, and Catherine Ann Gursky, Esq. Associate Executive Director at Bellevue, continually misrepresented Derya's condition to keep her at Bellevue.

84) In the court proceedings, Dr. Shah indicates that it is "possible" that Derya's diagnosis of Auto immune encephalitis caused Derya to act in the way she was.

85) Bellevue's position, Doctors, staff, and Officials, put forward by Defendants Dr. Robert Nathan Link, Chief Medical Officer, Medical Director at Bellevue Hospital, Dr. Nikita Shah, and Catherine Ann Gursky, Esq. Associate Executive Director at Bellevue, continually misrepresented continue to resist the transferring of Derya back to her home in New Jersey and into the care of her parents and her standing doctors and treatment.

86) Bellevue position, Doctors, staff, and Officials act petulantly, intentionally, negligently, and recklessly to deny Darya treatment causing her and her parents increased anxiety and suffering.

87) The Judge rules that family can transfer Derya to another facility.

88) On May 31:  Dr. Shah was informed that we were going to see a lawyer in regards to the hospital's treatment of Derya.  That night Derya was given Haldol.

89) On June 21, a Second Family Meeting is held.  Dr. Shah informs family that Derya was given Haldol the night before.  In meeting Dr. Shah states that the Immunologist Fellow ruled out AE and PANS as the diagnosis.

90) On June 21 at Court – the Defendant Hospital requests the ability to force medications on Derya. The court sides with family and requires the hospital test Derya before the medication can be forced on Derya.

91) On July 5 at the Hearing, the Defendants continue to willfully, intentionally, negligently, and recklessly act to keep imprisoning Derya.

92) On July 5:  Court, due to the Defendants intentionally incorrect, negligent, and reckless diagnosis, Derya is court ordered to remain 6 months at Bellevue.

93) Meeting with Dr. Nathan Link (Chief of Medicine at Bellevue) the parents are informed by Dr. Link that if testing comes back negative for AE that Derya will be considered bi-polar/manic.  Dr. Link states he is willing to transfer Derya as a Neurological Patient

94) During this time period, Derya's behavior continues to worsen, which Bellevue responds to by the following.  After restraint of Derya Plaintiff James Baldini observes multiple staff "glorifying" in their actions of Derya's restraint (Derya is in quiet room crying.  He states: "I passed the room when I was told to leave the area.  She appeared to be bound.

11

She was screaming and crying for help. I waited out of locked area to talk to staff about my concerns. I observed through the window multiple staff making hand motions. I could also hear them talking about the restraint, laughing and joking about the incident. At one point two staff members left the locked area, one holding her hand, saying: "She only does this when the parents are here." She had been bit by Derya. This wasn't the first time this staff member had said this about parents."

95) Plaintiff James talks to William Hicks (Chief Executive of Bellevue Hospital) about his concerns. Plaintiff was told the matter will be investigated.

96) Dr. Shah continues to mistreat Derya by ignoring her standing diagnosis and previous treatment.

97) Derya is transferred out of Dr. Shah's care.

98) Bellevue treatment now includes some antibiotics for infection.

99) Having been unsuccessful trying to get her daughter back, Plaintiff Samime contacts her insurance company and informed them that Bellevue is ignoring the Standing treatment, standing for one year and one half, and that they had approved and that the insurance company was paying for a treatment that was harming Derya.

100)    On July 12 (Tuesday): Dated letter from Insurance Company cutting off Derya's treatment at Bellevue, stating that she should be removed to another location better suited to her needs. (Not received by parents until July 16, 2016)

101)    On July 15 (Friday): Family meeting with multiple staff of Psychiatric United - Meeting headed by Dr. Link.

102)    Hospital makes plans to keep Derya for her 6 month stay as medical tests came

back negative. Dr. Hajin (New doctor for Derya) asks for a sit down with the family to

get a family history and to get a chance to work with family.

103)    July 16 (Saturday):  Letter from the Insurance company arrives at home.

104)    July 18 (Monday): Phone call from Hospital setting up discharge date as initially

July 21.  This is changed to July 20th from a later phone call.

100)July 20, 2016, her Parents pick Derya up from Bellevue Hospital on July 20 and bring

her home to Sussex County New Jersey.  Derya was transported back home without incident

proving Defendant's willful, intentional, negligent, and reckless claims to the contrary as

their excuse to imprison her as the baseless lies they were, meant solely to extend their

tortious behavior in imprisoning Derya and to increase the amount of insurance money they

received.  And for the purpose of the perverse joy they achieved by demonstrating that they,

the Hospital had the power to keep a child from her mother.  Said bureaucrats exhibited at all

times an egotistical and arrogant satisfaction of such bureaucrats masquerading as a Doctor

and medical personnel when what they really are, are hack creeps who get a sick thrill out of

lording their power over people unlucky enough to wander into their clutches.


POST BELLEVUE Derya's treatment has included the following:

105)    In July, 2016, a Doctor's visit with Dr. Blanchard.

106)    In August, 2016, a Doctor's visit with Dr. Bouboulis.

107)    Multiple phone calls with Dr. Najjar about treatment.

108)    A Letter from Najjar stating that he no longer believes Derya has AE, advises we

go to other facilities.

13

109)     In September 2016, UPENN - Dr. Rubenstein was willing to do a Spinal Tap.

110)     In October 2016, (Week of 19th) Derya is given first round of treatment of IVIG

at Dr. Bouboulis direction.

111)     In December 2016, Derya Visits St. Peter's University Hospital, Dr. Jyonchi and

Dr. LeMastra (Neurology Chief – Pediatrics.)

112)     In February 2017, a Spinal Tap at UPENN occurs.

113)     No Anti-body found within in Spinal Tap (Dr. Lancaster). Refuses to accept

diagnosis and will not treat.

114)     In March 2017, IVIG/ Solumedrol (Steroids) treatment is resumed.

115)     Treatments continue (Every three-week period - to current)

116)     In June 2017, the drug Cellcept is added to regimen (Anti-rejection drug.)

117)     In September 2017, a Dr. Jennifer Werely visit. Concurs with Sero-negative

Autoimmune Encephalitis.

118)     In October 2017, the treatment of the drug Rhutixma (Round 1) is added with all

of the attending risks of this medication, damages still yet to be determined.

119)     Plaintiff could not see and could not take care of their daughter while she was

removed from her home caused both parents and child severe distress and constituted

outrageous conduct on behalf of Defendants.

120)     Plaintiff's conduct delayed her standing diagnosis and care for at least the 75 days

she was treated by an incorrect diagnosis.

121)     Damage for Derya include: Loss of 1 and a half years (Since Fall of 2016) - of

education, Potential Brain Damage, Increased physical illness during recovery. Further

damages for Derya include bruises, unnecessary restraints, loneness, frustration, sense of

helplessness, sadness, fear, and terror at being away from the safety and security of the care

of her parents and the surroundings of her room at home in New Jersey

122)     This delay has caused undue added stress and pain to Parent Plaintiff and child.

123)     Derya's general behavior Prior to removal of terratoma:  Hallucinations of colors,

individuals, manifestations - chip in her brain and the television attacking

her.  Unexplained (inappropriate timing) of laughter, talking to no one present,

fears/anxiety of going to the bathroom without accompaniment.

124)     Derya's general behavior after leaving Bellevue Hospital: Aggressiveness, biting,

hitting, hallucinations.  Unexplained (inappropriate timing) of laughter, talking to no one

present, fears/ anxiety of anything.  Yelling and screaming, unable to toilet herself,

shower or personal hygiene care.  Undressing, exposing self, lack of reasonable

conversation (disjointed and random talk of inconsequential and nonsensical statements.)

125)     Damages for James include: increased Stress: five to six visits to NYC a week,

concern about what was being done to Derya (Unexplained bruising), stress on their

Marriage, Damages also include increased Stress: five to six visits to NYC a week, concern

about what was being done to Derya (Unexplained bruising). (Forced to stay home for

FMLA to care for Derya Demirtas, Repeated visits to NYC.)

126)     Damages also include the terror and unwarranted cruelty of keeping a daughter

from her father.

127)     Damages for Samime Baldini include: crying uncontrollably, the trauma of

watching Derya taken away, the distressed phone call begging for us to come and get her,

and the frustration and helplessness to do so, the mistreatment by Hospital Medical Staff

(condescending behavior), On Derya, multiple bruises on her arms and legs, after suffering

multiple restraints, one confirmed instance where the staff were glorifying in restraining Derya. Damages inflicted upon Samime also include increased Stress: five to six visits to NYC a week, concern about what was being done to Derya (Unexplained bruising), stress on their Marriage.   Damages inflicted on Samine also caused Health Issues for Samimie: Weight Gain (Samime), heart palpations (Samime), Loss of income from taking time off to go to Bellevue.

128)      Damages for Samime also include the terror, unwarranted cruelty, and separation anxiety of the unconscionable separation of a daughter from her mother.

**INJURY (TORT) COUNT 1:**

**FALSE IMPRISONMENT**

129)      Plaintiff incorporates all paragraphs above as if fully stated herein.

130)      Defendant Bellevue Hospital, Dr. Shah, Dr. Robert Nathan Link, Catherine Ann Gursky, esq., staff, and Officials knowingly, willfully, intentionally, negligently, and recklessly kept Plaintiff Derya from her parents for 75 days against her will and the will of her parents for no good reason.

131)      Defendant Bellevue Hospital, Dr. Shah, Dr. Robert Nathan Link, Catherine Ann Gursky esq., staff, and Officials knowingly, willfully, intentionally, negligently, and recklessly kept Plaintiff Derya from her parents for 75 days against her will and the will of her parents despite a standing diagnosis and successful treatment plan for no good reason.

132)      Defendant's action of keeping their daughter Derya from her parents for 75 days was a willful detention.

133)      Defendant's action of keeping their daughter Derya from her parents for 75 days was without consent of the daughter or the parents.

134)     Defendant's actions of keeping their daughter Derya from her parents for 75 days was unlawful as the Defendants ignored and mislead all parties with a false diagnosis for the purposes of ego and the insurance money.

135)     **THERFORE,** Plaintiffs suffered the Injuries at the hands of Defendants, and prays that this Honorable Court grants them redress.

136)     **WHEREFORE,** Plaintiffs James Baldini, his wife Samime Baldini and their child Derya Dermitate,  prays to This Honorable Court that a judgment be entered in his favor and against the defendants jointly and severally in excess of $75,000, specifically **Seventy-Five million dollars, one million for each day Derya was kept from her family and her treatment in New Jersey,** including punitive damages due to the outrageousness of Defendants' conduct, or whatever amount the Jury deems appropriate plus costs, and attorney fees if deemed appropriate.

## INJURY (TORT) COUNT 2:

## LOSS OF CONSORTIUM

137)     Plaintiff incorporates all paragraphs above as if fully stated herein.

138)     Defendant Bellevue Hospital, Dr. Shah, Dr. Robert Nathan Link, Catherine Ann Gursky, esq., staff, and Officials knowingly, willfully, intentionally, negligently, and recklessly kept Plaintiff Derya from her parents for 75 days against her will and the will of her parents for no good reason.  Said actions caused plaintiffs to suffer deprivations identified to include the economic contributions of the injured child to the household, care and affection.

139)     Defendant Bellevue Hospital, Dr. Shah, Dr. Robert Nathan Link, Catherine Ann Gursky esa., staff, and Officials knowingly, willfully, intentionally, negligently, and

17

recklessly kept Plaintiff Derya from her parents for 75 days against her will and the will of her parents despite a standing diagnosis and successful treatment plan for no good reason also caused the damages of having the parents have to take off time from work, and incur travel expenses and living expenses, and legal expenses.

140) **THERFORE,** Plaintiffs suffered the Injuries at the hands of Defendants, and prays that this Honorable Court grants them redress.

141) **WHEREFORE,** Plaintiffs James Baldini, his wife Samime Baldini and their child Derya Demirtas,  prays to This Honorable Court that a judgment be entered in his favor and against the defendants jointly and severally in excess of $75,000, specifically **Seventy-Five million dollars, one million for each day Derya was kept from her family and her treatment in New Jersey,** including punitive damages due to the outrageousness of Defendants' conduct, or whatever amount the Jury deems appropriate plus costs, and attorney fees if deemed appropriate.

## INJURY (TORT) COUNT :3

### ABUSE OF PROCESS

142) Plaintiff incorporates all paragraphs above as if fully stated herein.

143) Defendant Bellevue Hospital, Dr. Shah, Dr. Robert Nathan Link, Catherine Ann Gursky, esq., staff, and Officials knowingly, willfully, intentionally, negligently, and recklessly kept Plaintiff Derya from her parents for 75 days against her will and the will of her parents despite a standing diagnosis and successful treatment plan for no good reason.

144) Defendant Bellevue Hospital, Dr. Shah, Dr. Robert Nathan Link, Catherine Ann Gursky, esq., staff, and Officials knowingly, willfully, intentionally, negligently, and recklessly kept Plaintiff Derya from her parents for 75 days against her will and the will of

her parents despite a standing diagnosis and successful treatment plan for the ulterior and improper purpose of securing the money from Derya's medical insurance, and for the ulterior and improper purpose of their spiteful egos.

145)   The fact that the Defendants gave up trying to keep Derya when her insurance company ceased payments demonstrates the Defendant's malice and improper motive.

146)   Defendants misused the legal process at the New York City Mental Health Court by misleading the Court as to Derya's condition to continue to prevent Derya from going home to New Jersey to obtain insurance monies and for their spiteful egos.

147)   **THERFORE**, Plaintiffs suffered the Injuries at the hands of Defendants, and prays that this Honorable Court grants them redress.

148)   **WHEREFORE**, Plaintiffs James Baldini, his wife Samime Baldini and their child Derya Dermitate,  prays to This Honorable Court that a judgment be entered in his favor and against the defendants jointly and severally in excess of $75,000, specifically **Seventy-Five million dollars, one million for each day Derya was kept from her family and her treatment in New Jersey,** including punitive damages due to the outrageousness of Defendants' conduct, or whatever amount the Jury deems appropriate plus costs, and attorney fees if deemed appropriate.

## INJURY (TORT) COUNT: 4

## MALICIOUS PROSECUTION

149)   Plaintiff incorporates all paragraphs above as if fully stated herein.

150)   Defendant Bellevue Hospital, Dr. Shah, Dr. Robert Nathan Link, Catherine Ann Gursky, esq., staff, and Officials knowingly, willfully, intentionally, negligently, and

19

her parents despite a standing diagnosis and successful treatment plan for no good reason also caused the damages of having the parents have to take off time from work, and incur travel expenses and living expenses, and legal expenses.

166)     **THERFORE**, Plaintiffs suffered the Injuries at the hands of Defendants, and prays that this Honorable Court grants them redress.

167)     **WHEREFORE,** Plaintiffs James Baldini, his wife Samime Baldini and their child Derya Demirtas,  prays to This Honorable Court that a judgment be entered in his favor and against the defendants jointly and severally in excess of $75,000, specifically **Seventy-Five million dollars, one million for each day Derya was kept from her family and her treatment in New Jersey,** including punitive damages due to the outrageousness of Defendants' conduct, or whatever amount the Jury deems appropriate plus costs, and attorney fees if deemed appropriate.

## INJURY (TORT) COUNT: 6

## NEGLIGENT INFLICTION OF EMOTIONAL DURESS

168)     Plaintiff incorporates all paragraphs above as if fully stated herein.

169)     Defendant Bellevue Hospital, Dr. Shah, Dr. Robert Nathan Link, Catherine Ann Gursky, esq., staff, and Officials knowingly, willfully, intentionally, negligently, and recklessly kept Plaintiff Derya from her parents for 75 days against her will and the will of her parents for no good reason.  Said actions caused plaintiffs to suffer mental and emotional anguish.

170)     Defendants Conduct in keeping Derya away from her home were extreme and outrageous.

187)     **WHEREFORE,** Plaintiffs pursuant to the Constitutions and laws of the State of New Jersey, State of New York, and the Federal Constitution demand judgement against the defendants for the above described damages including attorney fees, punitive damages, and appropriate costs.

Respectfully submitted,

James Baldini (Pro Se)
15 Devita Rd.
Branchville NJ 07860
Tel phone.: 862-266-7392
Email: authorjamesbaldini@gmail.com

Samime Baldini

Samime Baldini for Derya Demirtas

On the     17th     day of October,

In the Year of Our Lord 2017

**WHEREFORE**

## JURY DEMAND

Plaintiff James Baldini (Pro Se) demands a trial by Jury in this matter.

**BY:** _____

**Date:** _____

25